Wayne R. GLOCK et al.
v.
A. H. CARPENTER et al.

Raymond R. CALVERT
v.
A. H. CARPENTER et al.

Robert E. JOHNSON
v.
A. H. CARPENTER et al.

Grace WILLIAMS et al.
v.
A. H. CARPENTER et al.

G. A. McDOWELL et al.
v.
A. H. CARPENTER et al.

H. F. GARTON
v.
A. H. CARPENTER et al.

Claude C. JOHNSON
v.
A. H. CARPENTER et al.

Nos. 1033, 1035, 1044, 1046, 1048,
1072, 1076.

United States District Court
E. D. Kentucky,
at Lexington.

Jan. 6, 1960.

J. Marshall McCann, Troy D. Savage, Lexington, Ky., for plaintiffs.

Shumate & Shumate, Irvine, Ky., Michael A. Rowady, Winchester, Ky., for defendants.

HIRAM CHURCH FORD, Chief Judge.

Plaintiffs seek damages for fraud alleged to have been practiced upon them by the defendant A. H. Carpenter and his agent, J. F. Shepperd, in inducing them to purchase fractional working interests in gas leases owned by the defendant Carpenter upon lands located in an area referred to in the testimony as the "Furnace Area" in Powell and Estill counties, Kentucky.

The above entitled cases were consolidated for trial and were tried to the Court without the intervention of a jury.

The facts disclosed by the record are in substance as follows:

South Central Petroleum Corporation, of which the defendant A. H. Carpenter was president, owned a gas lease located in the Furnace Area in Estill county upon the farm of J. M. Garrett.

Commencing on August 12, 1947, the South Central Petroleum Corporation, with Carpenter in charge as contractor, drilled a gas well upon the Garrett lease. The well was completed September 30, 1947, and it had the appearance of substantial gas production. This well is known and referred to in the record as "Garrett No. 1" and it is also referred to as the "discovery well."

On October 7, 1947, at the invitation of Mr. Carpenter, W. B. Maxwell, manager of the Geology Department of the United Fuel and Gas Company, Charleston, W. Va., made a field test of the gas in Garrett No. 1 which revealed the gas from this well to be contaminated in that it was 45% carbon dioxide, a gas which would not burn, and contained 300 grains of hydrogen sulfide, a corrosive, per hundred cubic feet, all of which was promptly reported to Mr. Carpenter, together with the information that United Fuel would not purchase the gas from this well so contaminated unless the contamination were removed. Mr. Maxwell later mailed to Mr. Carpenter a copy of the laboratory analysis which confirmed the field analysis.

For the same corporation and upon the same farm Mr. Carpenter completed the drilling of a second gas well on December 14, 1947, referred to in the evidence as Garrett No. 2, the test of which showed the gas from it to be contaminated to about the same extent as Garrett No. 1. Mr. Carpenter made a diligent investigation as to the prospect of cleaning the contaminated gas produced from these wells. The high cost of such procedure was obviously quite prohibitive.

Shortly after Garrett No. 1 was completed and tested, Mr. Carpenter by his agent, J. F. Shepperd, inaugurated an energetic campaign to sell fractional working interests to the plaintiffs, all of whom resided out of the state of Kentucky, in gas leases which Carpenter individually acquired in a large area in the general neighborhood of the Garrett farm, known as the "Furnace Area", which leases were upon farms referred to in the record as the "Hood Wise" lease, "Elbert Wasson" lease, "Ida Barnes Nicholas" lease, "Tipton" lease, "James Smyth" lease, "James Hall" lease, and "Pete Wells" lease.

During the course of the procedure to induce plaintiffs to invest in these leases, the various plaintiffs, sometimes accompanied by Mr. Shepperd, visited Mr. Carpenter at Winchester, Kentucky, and were conducted on tours of inspection of the so-called gas field and on such occasions Mr. Carpenter represented that the well known as Garrett No. 1 signified an enormous gas discovery in that area; that the gas produced was pure, sweet, premium gas and all that needed to be done to realize a large profit was to turn it into a pipeline and put meters on the wells; that the gas could be marketed readily; that a gas transmission company would be willing to put in a pipeline to take the gas, and that a fabulous profit could be realized by investors in the wells. There is testimony indicating that Shepperd made representations similar to those made by Carpenter to induce plaintiffs to invest in the leases and that Carpenter said he would back up and stand behind anything Shepperd said in regard to the wells. Carpenter and Shepperd met with some of the plaintiffs in Indiana, where most of them resided, and made substantially the same representations in respect to the quality of the gas and the enormous profits to be derived from investments in fractional working interests in the wells being drilled and proposed to be drilled in the Furnace Area.

These representations related to matters of material fact. They were false and were made by Carpenter as well as by Shepperd with knowledge that they were false and under circumstances which did not justify honest belief in their truth. Such representations went far beyond the permissible limits of legitimate "sales talk".

At the time of their investments the plaintiffs were unaware of the facts as to the inferiority of the gas produced in the discovery well. The facts disclosed by the analysis of the gas were concealed by the defendant Carpenter. Such concealment under the attendant facts and circumstances, as well as the assertion of what was false, constituted actionable fraud. Fields v. Cornett, 254 Ky. 35, 42, 70 S.W.2d 954; Kaze v. Compton, Ky., 283 S.W.2d 204, 207.

The plaintiffs relied upon the representations made by Carpenter and Shepperd and were induced thereby to make and did make investments as hereinafter stated in fractional working interests in the leases, payments for which were made through Shepperd and were sent to and received by Carpenter. Mr. Carpenter drilled wells on certain of the leases, some of which produced gas, but all of which gas was contaminated to substantially the same extent as the Garrett wells.

In 1952 and 1953 the plaintiffs and others who had purchased interests in the wells in question joined in a contract employing Harry G. Witt to market the gas and to distribute to the respective owners their proportionate share of the net proceeds. Since 1952 the gas has been marketed to South Central Petrole-

um Corporation which resold some of it to a nearby brick plant for firing brick and has used the remainder for running engines of oil well pumps, repressuring and experimentation in the secondary recovery of oil. In Dunn v. Tate, Ky., 268 S.W.2d 925, the Kentucky Court of Appeals held that by such action defrauded purchasers are not precluded from maintaining actions for damages and that the language of previous decisions to the contrary was merely *obiter dictum.*

By 1954 the rock pressure of the gas wells had declined considerably and has continued to decline rapidly. On February 9, 1958, the pressure of the James Smyth well was 110 pounds, the Hood Wise 70 pounds and the Elbert Wasson 65 pounds. The leases in which plaintiffs invested have little or no present commercial value.

It appears from the record that the investments made by the plaintiffs respectively and the amounts received by each of them from gas sales made by Mr. Witt are as follows:

Dr. Wayne R. Glock on December 11, 1947, paid $2,000 for $\frac{1}{16}$ of $\frac{7}{8}$ working interest in the Hood Wise lease; on March 29, 1948, he paid $2,562.50 for $\frac{1}{64}$ of $\frac{7}{8}$ working interest in the Hood Wise lease; on April 28, 1948, he paid $8,000 for $\frac{1}{16}$ of $\frac{7}{8}$ working interest in the Elbert Wasson lease; on June 8, 1948, he paid $3,000 for $\frac{1}{64}$ of $\frac{7}{8}$ working interest in the Ida Barnes Nicholas lease, and on August 16, 1948, he paid $1,875 for $\frac{1}{128}$ of $\frac{7}{8}$ working interest in the Jim Hall lease. The total investment of this plaintiff was $17,437.50. From the operations by Mr. Witt he received $739.69, resulting in a pecuniary loss to him in the sum of $16,697.81.

Dr. Raymond R. Calvert on May 3, 1948, paid $8,000 for $\frac{1}{16}$ of $\frac{7}{8}$ working interest in the Elbert Wasson lease; on June 7, 1948, he paid $12,000 for $\frac{1}{16}$ of $\frac{7}{8}$ working interest in the Ida Barnes Nicholas lease; on August 16, 1958, he paid $7,500 for $\frac{1}{32}$ of $\frac{7}{8}$ working interest in the James Hall lease, and on December 15, 1948, he paid $3,500 for $\frac{1}{64}$ of $\frac{7}{8}$ working interest in the Pete Wells lease. The total investment of this plaintiff was $31,000. From the operations by Mr. Witt he received $940.92, resulting in a pecuniary loss to him in the sum of $30,059.08.

Robert E. Johnson on August 23, 1948, paid $1,875 for $\frac{1}{128}$ working interest in the James Hall lease. From the operations by Mr. Witt this plaintiff received $57.71 from a $\frac{1}{128}$ of $\frac{7}{8}$ working interest in the Hood Wise lease which was given to him by Carpenter in exchange for plaintiff's interest in two oil wells which had turned out to be dry holes. The resultant pecuniary loss to this plaintiff was $1,817.29.

Claude C. Johnson on November 8, 1948, paid $3,500 for $\frac{1}{64}$ of $\frac{7}{8}$ working interest in the Pete Wells lease. From the operations by Mr. Witt he received $117.75 from a $\frac{1}{128}$ of $\frac{7}{8}$ working interest in the Elbert Wasson lease which was given to him by Carpenter in exchange for an investment in an oil lease on which the well was dry, and from joint investments with Dr. H. F. Garton hereinafter enumerated. The resultant pecuniary loss to this plaintiff was $3,382.25.

Dean Williams on June 10, 1948, paid $12,000 for $\frac{1}{16}$ of $\frac{7}{8}$ working interest in the Ida Barnes Nicholas lease; on August 21, 1948, he paid $3,750 for $\frac{1}{64}$ of $\frac{7}{8}$ working interest in the James Hall lease, and on October 29, 1948 he paid $1,500 for $\frac{1}{128}$ of $\frac{7}{8}$ working interest in the Pete Wells lease. The total investment of this plaintiff was $17,500. From the operations by Mr. Witt, he received $480.32, resulting in a pecuniary loss to him in the sum of $16,769.92.

Dr. G. A. McDowell, as shown by stipulation (Tr. 460), invested a total sum of $23,250 in various of the leases. From the operations by Mr. Witt he received $611.08, resulting in a pecuniary loss to him in the sum of $22,638.92. The defendant A. H. Carpenter sets up as a defense to the claim of Dr. McDowell a document signed by him releasing all claims against Carpenter and his agent J. F. Shepperd growing out

of the leasing of certain oil wells on property known as the Pilot Property in Eastern Kentucky. This release does not relate to or bar any of the claims asserted in this action.

Dr. H. F. Garton on December 10, 1947, paid $1,000 for ½₂ undivided working interest in the Furnace Area, referred to as the "Pres Smith farm". On February 9, 1948, he paid $1,000 for ½₄ undivided working interest in 200 acres in the Furnace Area, and on October 14, 1948, he paid $3,500 for ½₄ of ⅞ working interest in the Pete Wells lease. The total investment of this plaintiff was $5,500. From the operations by Mr. Witt plaintiff has received, including receipts from joint investments with Claude C. Johnson hereinafter enumerated, $788.31, resulting in a pecuniary loss to him in the sum of $4,711.69.

Dr. H. F. Garton and Claude C. Johnson on June 8, 1948, jointly paid $3,000 for ½₄ of ⅞ working interest in the Ida Barnes Nicholas lease; on August 23, 1948, they paid $7,500 for ½₂ of ⅞ working interest in the James Hall lease. The total joint investment of these plaintiffs was $10,500. From the operations of Mr. Witt they received certain sums which have been credited against their separate individual investments. The resultant pecuniary lss to these plaintiffs from their joint investments is the sum of $10,500.

▉ The large and apparently exorbitant prices which plaintiffs were induced to pay for the purchase of small fractional working interests in these leases are further indication of the fraudulent scheme of Carpenter and Shepperd to secure large sums of money from credulous investors. Henderson v. United States, 6 Cir., 202 F.2d 400, 404.

As late as April, 1949, Carpenter was still representing to investors that the gas was not being marketed because the field was not fully developed. Defendants' contention that the actions are barred by the five-year Kentucky Statutes of Limitation relating to fraud

(KRS § 413.120 and § 413.130) seems untenable.

▉ In addition to the claims for damages, plaintiffs seek to have set aside, as a transfer made without consideration and with the intention of defrauding creditors in violation of Kentucky Revised Statutes §§ 378.010 and 378.-020, the purchase of certain shares of stock in the South Central Petroleum Corporation by Carpenter in the name of his wife the defendant, Margaret L. Carpenter.

On February 17, 1948, the defendant Margaret L. Carpenter entered into a contract with James F. Frenzel by which she agreed to purchase all the latter's interest in the South Central Petroleum Corporation for a consideration of $18,-000, of which sum $2,000 was to be paid on the signing of the contract and the remainder at the rate of $1,000 per month. The interest acquired by the defendant Margaret L. Carpenter under this contract was represented by 82 shares of stock which were transferred to her on July 16, 1949, after the final payment on the contract.

The $2,000 down payment was made by A. H. Carpenter for his wife by check dated February 17, 1948. The check bears the notation "For Margaret L. Carpenter contract dated 2-17-48." Twelve of the remaining payments were made by Carpenter by checks drawn on his personal account. Two other payments were made by Carpenter by checks drawn on the account of South Central Petroleum Corporation and signed by him for the Corporation. These payments made by Carpenter total $16,000. Margaret L. Carpenter made two payments in the amount of $1,000 each by checks dated December 16, 1948, and January 17, 1949, drawn on "Oil account".

The "Oil account" money was obtained by Margaret L. Carpenter as royalties from an oil lease known as the Children's Home lease, which she acquired August 4, 1948, the consideration for which lease was also paid by A. H. Car-

penter, but which lease was taken in the wife's name.

Margaret L. Carpenter testified that she had no property when she married Carpenter in 1941; had inherited no property; that she had worked a few months in a restaurant in Cincinnati in 1945 and in Texas in 1946. She further testified that she had not been paid for work in the office of the South Central Petroleum Corporation prior to 1950.

Mrs. Carpenter testified that the payment for the stock by her husband was in the nature of a loan, and that she had repaid him. He also testified she had repaid him and introduced two checks dated in January, 1949, showing she had reimbursed him in the amount of $3,000 out of the "Oil account." They further testified that a check evidencing a repayment by Mrs. Carpenter in the amount of $5,000 had become lost.

Sonia Frenzel Hoadley, widow of James F. Frenzel, who died in 1950, testified that when her late husband talked to Carpenter about selling him his interest in South Central Petroleum Corporation, Carpenter told her he didn't want to purchase the stock in his own name because he had too many creditors, but that he would discuss the matter with his wife and put the stock in her name. Carpenter denied this conversation.

In respect to this transaction, Mrs. Carpenter has not sustained the burden of proof resting upon her.

Pursuant to order of September 2, 1959, the issues made by the pleadings against the California Company were severed from other issues of this case and will be set for trial at a future date.

### Conclusions of Law

(1) The Court has jurisdiction of the parties and the subject matter involved in these actions. Title 28 U.S.C.A. § 1332.

(2) Concealment of material facts as well as misrepresentation of material facts as shown herein constituted actionable fraud. Fields v. Cornett, 254 Ky. 35, 42, 70 S.W.2d 954; Kaze v. Compton, Ky., 283 S.W.2d 204, 207.

(3) In Sanders, Inc. v. Chesmotel Lodge, Inc., 300 S.W.2d 239, 241, the Kentucky Court of Appeals said:

"The fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud. 24 Am.Jur., Fraud and Deceit, Section 226, page 54. In Restatement of the Law of Torts, Volume 3, Section 549, page 108, the rule is stated as follows:

" 'The measure of damages which the recipient of a fraudulent misrepresentation is entitled to recover from its maker as damages * * * is the pecuniary loss which results from the falsity of the matter misrepresented, including

" '(a) the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it, and

" '(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the truth of the representation.' "

Under this authority, the damages which the plaintiffs are respectively entitled to recover from the defendant A. H. Carpenter is the pecuniary loss sustained by them as the proximate result of the fraudulent concealment and misrepresentations herein set out, as hereinabove computed. Sanders, Inc. v. Chesmotel Lodge, Inc., Ky., supra; Restatement of the Law of Torts, Vol. 3, § 549, page 108.

(4) When a transaction between persons occupying a confidential relationship, such as the transfer of stock by the defendant A. H. Carpenter to his wife, Margaret L. Carpenter, is exposed to scrutiny, the burden is always upon the recipient of the property to show that the conveyance was fairly made and not tainted with an intent

to accomplish a fraudulent purpose. As above stated the defendant Margaret L. Carpenter has not met this burden. The transfer of stock to her was in violation of Kentucky Revised Statutes, §§ 378.-010 and 378.020 and should be set aside. Bolling v. Adams, Ky., 296 S.W.2d 696.

(5) In each of the above entitled cases judgment should be entered in favor of the respective plaintiffs against A. H. Carpenter and Margaret L. Carpenter, his wife, in conformity with the views herein expressed. Each of the judgments so entered will bear interest from the date of entry.