Paull ANDERSON, Plaintiff–Appellee,

v.

Julius Jennings WADE, Jr., James H. Wade, Margaret L. Godley, Godley, Inc., Wade and Wade, Attorneys at Law, Defendants–Appellants.

No. 00–6249.

United States Court of Appeals, Sixth Circuit.

March 29, 2002.

Before NORRIS and CLAY, Circuit

Judges; and SARGUS, District Judge.*

CLAY, Circuit Judge.

In this diversity of citizenship action brought pursuant to 28 U.S.C. § 1332(a)(1), defendants, Julius Jennings Wade, Jr., James H. Wade, Margaret Godley ("Godley"), Godley, Inc., and Wade and Wade, Attorneys at Law, appeal from the district court's order awarding Plaintiff Paull Anderson ("Anderson") $111,200.53 in compensatory damages and $500,000 in punitive damages for their fraudulent representations in connection with an option contract arising under Kentucky law. For the reasons that follow, we AFFIRM the district court's judgment.

## I. BACKGROUND

The present case arises from an option contract entered into by Anderson of Bristol, Virginia with Godley of Mecklenburg County, North Carolina. For $15,000, Anderson purchased a $3 million option to acquire 24,700 acres of land in Knott, Perry and Breathitt counties in eastern Kentucky in 1993. Godley and her since deceased husband were the principal shareholders of Godley, Inc., a closely held family corporation formed for the specific purpose of holding title to the land in question. Godley claimed title to the land by virtue of the so-called De-Groot Patents, a series of patents (or tracts) issued to W.H. DeGroot & Company by the Commonwealth of Kentucky in 1870. Before Anderson entered into the option contract with Godley, however, the DeGroot Patents had been declared facially void. *Bessie Berry, et al. v. Cyprus Coal Company, et al.*, No. 84-53 (E.D.Ky. March 20, 1992), aff'd. *Berry v. Cyprus Coal*, 1993 WL 78780 (6th Cir. March 19, 1993)). ["Cyprus Coal litigation"]. Moreover, Godley did not appeal from this Court's affirmance of the district court's decision holding that the DeGroot Patents were facially void. Defendants Julius Jennings Wade, James H. Wade and their law firm, Wade and Wade, of Charlotte, North Carolina represented Godley in the Cyprus Coal litigation.

Nevertheless, on April 30, 1993, slightly more than one month after this Court's decision in the Cyprus Coal litigation, Anderson and his business associates met with the Wades in their law office in Charlotte, North Carolina to discuss the proposed purchase of the property in question through the acquisition of the stock of Godley, Inc. At the meeting, Julius Wade assured Anderson and his business associates that Godley would provide good title and title insurance for the property. Anderson and David Michael Middleton, a mortgage broker whom Anderson had retained to underwrite the transaction, informed the Wades about their interest in developing the crude oil and timber on the property. At the meeting, Anderson also looked through an engineering consultant's report ("Skelly Loy report") that the Wades had placed on the table near him about the abundant natural resources to be found on the property. At no time during the meeting did the Wades disclose to Anderson the fact that Godley did not have valid title to the property.

Anderson entered into the option contract with Godley on May 7, 1993. Under the terms of the contract, Anderson paid $15,000 for an option to purchase the stock of Godley, Inc. for $3 million, and thereby acquire 24,700 acres of land in eastern Kentucky. Anderson agreed to forfeit the

---

* The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

$15,000 deposit if he failed to exercise his option by June 6, 1993. In addition, the contract allowed Anderson to pay an additional $15,000 to extend the option until July 7, 1993. If Anderson failed to complete the purchase by that date, he would forfeit both $15,000 payments.

After entering into the option contract with Godley, Anderson, through Mr. Burton Theriault and his wife, Mrs. Lee Theriault, of Leeway Marketing, entered into an agreement on May 14, 1993 with Dr. Won Ming Song of S.D.D. International Investment & Trade Corporation ("S.D.D.") for S.D.D. to broker timber for him from the land in question in exchange for $11,100,000. Under the agreement, S.D.D. was to resell the timber to China Timber Import and Export Service ("China Timber"). To secure the transaction, S.D.D. deposited $296,000 as a performance bond with China Timber. In addition, Anderson hired C.C. Canada Forestry Co. to determine the type and quantity of the timber found on the property. During May of 1993, Anderson also contracted the services of Gregory Childress, who investigated the potential use of crude oil found on the property. In addition, Anderson retained the services of the Middleton Group to underwrite this project and to determine the extent of the mineral and natural resources on the land.

In May of 1993, Anderson also got in touch with Christen W. Burkholder, an attorney in Bristol, Virginia, to review the option contract for him. In the course of his conversation with Anderson, Burkholder learned that one of Anderson's business associates had inspected the property and heard that Godley had lost a case involving the Cyprus Mining Company. Researching the matter on May 14, 1993, Burkholder came across this Court's opinion in the Cypress Coal litigation finding Godley's title claim to be facially void, and immedi-

ately informed Anderson about it. Burkholder then called Julius Wade requesting a written assurance concerning the validity of Godley's title to the property. After leaving various messages, Burkholder faxed a letter to Julius Wade on May 24, 1993 advising him that he had a copy of this Court's opinion in the Cyprus Coal litigation. Julius Wade immediately called Burkholder to assure him that the Cyprus Coal litigation had no effect on Godley's title to the property because it merely involved the narrow issue of trespass law. After an angry exchange in which Julius Wade denied that Godley's title to the property was facially void, Burkholder told him that Anderson wanted Godley to return Anderson's deposit and pay for his out-of pocket expenses. Julius Wade refused. Subsequently, Burkholder had conversations with Julius Wade on May 27 and 28, 1993, but there was no change in Julius Wade's position. On May 27, 1993, Anderson's mortgage broker, Middleton, also spoke with Julius Wade, who again insisted that Godley's title was valid and was unaffected by the Cyprus Coal litigation.

Burkholder then sent Julius Wade a letter on June 4, 1993 asking for the return of Anderson's deposit of $15,000 and itemizing Anderson's out-of-pocket costs, including statements from Anderson's business associates. Thereafter, Anderson did not exercise his right to purchase the property under the option contract, thus forfeiting his deposit of $15,000. Consequently, Anderson's transaction with Dr. Song of S.D.D. to market the timber from the property fell through, resulting in the forfeiture of S.D.D.'s performance bond with China Timber.

Afterwards, on June 18, 1993, Defendants sold another option on the Godley, Inc. stock to John F. Wolcott, Sr., as agent for the Foundation of Advancement, Edu-

cation & Employment of American Indians ("Foundation"), for $25,000.[1] On July 27, 1993, this option was extended for an additional $25,000. On September 3, 1993, Defendants sold one-half of the Godley, Inc. stock to the Foundation for $3 million, with the remaining shares conveyed by Godley to the Foundation as a charitable contribution. Thereafter, Godley claimed a $3 million tax credit for her "donation" to the Foundation, which was certified as a tax-exempt organization by the IRS. Subsequently, in April 1995, the Foundation proposed the sale of the property in question to other buyers for $28 million, supported by a letter from James H. Wade stating that Godley's title to the property was valid.

On April 27, 1994, Anderson, proceeding pro se, filed a three-count complaint against Defendants seeking compensatory and punitive damages. Count I alleged a violation of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1962, and conspiracy to violate 18 U.S.C. § 1962(a)-(c). Count II alleged a Kentucky common-law claim of intentional misrepresentation by Defendants regarding their claimed title to the property in light of the Cyprus Coal litigation. Count III alleged misrepresentations that induced Anderson to enter into a contractual relationship. Thereafter, Anderson moved for partial summary judgment on his claim that Defendants had knowledge that the DeGroot Patents had been adjudicated as null and void, and that there was no reasonable basis for them to believe otherwise. In a memorandum opinion and order dated December 1, 1995, the district court granted Anderson's motion for partial summary judgment on this basis. On May 8, 1997, the district court

granted Defendants' motion for summary judgment regarding Anderson's RICO claim asserted in Count I.

During discovery, Defendants repeatedly refused to respond to Anderson's discovery requests in an adequate manner. As a result of Defendants' repeated violations of court orders compelling discovery, the magistrate judge, in a report and recommendation dated August 13, 1997, recommended as sanctions that the district court grant Anderson a default judgment on the issue of Defendants' liability on his remaining state law claims pleaded in Counts II and III. Subsequently, the district court, in a memorandum opinion and order entered on September 29, 1997, adopted the magistrate judge's report and recommendation, granting in part and denying in part Anderson's motion for sanctions against Defendants for discovery violations based upon their obstructionist tactics. In defaulting Defendants on the issue of liability, the district court found in pertinent part:

The following are the specific grounds for the Court's acceptance of the Magistrate's Report and Recommendation: (1) the defendants have repeatedly failed to respond adequately to Anderson's discovery requests, which were ordered by the Court to be answered and were propounded back on December 12, 1995; (2) although the defendants had been warned on three separate occasions that failure to comply with the Federal Rules of Civil Procedure and/or orders of the Court could result in default judgment, they still refused to cooperate with discovery; (3) lesser sanctions have already been imposed and were unsuccessful; (4) any sanction short of default judgment on the remaining issues of liability

---

1. Anderson also introduced evidence that on November 12, 1992, before offering the property to him, Defendants sought to sell the property to another buyer, making the same assurances that Godley had valid title to the property.

would permit the defendants to benefit from their obstructionist tactics; and (5) another discovery order would only serve to multiply the proceedings and add to the defendants' mockery of the discovery process. Based on the above, the Court finds that only the harsh sanction of default judgment on the issue of liability will serve to deter future litigants from engaging in this type of behavior, adequately punish these defendants, and preserve the integrity of the court.

*Paull Anderson v. Julius Jennings Wade, Jr., et al.,* No. 94–111, slip op. at 7–8 (E.D.Ky. September 29, 1997).

By an order dated January 8, 1998, the district court then directed the magistrate judge to conduct a hearing on damages and to issue a report and recommendation on the same. After a hearing on April 29 and 30, 1998, the magistrate judge issued a report and recommendation on March 3, 2000. Ruling that Anderson had to prove his compensatory damages by "clear and convincing evidence," the magistrate judge found that Anderson was only entitled to compensatory damages of $15,000 for the return of his deposit for the option contract. In addition, the magistrate judge, finding that the Supreme Court of Kentucky in *Williams v. Wilson,* 972 S.W.2d 260 (Ky.1998) had invalidated the state's punitive damages statute, applied the Kentucky common-law standard, ruling that Anderson had failed to show that he was entitled to punitive damages arising from Defendants' contractual fraud.

Thereafter, Anderson filed his objections to the magistrate's report and recommendation. On June 15, 2000, the district court, in a revised memorandum opinion and order, accepted in part and rejected in part the magistrate's report and recommendation. Specifically, the district court, ruling that Anderson had to prove his com-

pensatory damages by a preponderance of the evidence, found that Anderson was entitled to compensatory damages in the amount of $111,200.53. In addition, the district court, applying the Kentucky common-law punitive damages standard, found that Anderson was entitled to $500,000 in punitive damages. On August 14, 2000, the district court entered an order denying Defendants' motion to alter or amend the judgment of June 15, 2000. Defendants now timely appeal.

## II. DISCUSSION

### A. Standard of Review

A federal court in a diversity action under 28 U.S.C. § 1332 applies the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Hayes v. Equitable Energy Resources Co.,* 266 F.3d 560, 566 (6th Cir.2001). In diversity cases, federal courts apply state law in accordance with the controlling decisions of the state supreme court. *Hisrich v. Volvo Cars of North America, Inc.,* 226 F.3d 445, 449 n. 3 (6th Cir.2000). In addition, a district court's findings of fact shall not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Thus, this Court may not reverse a district court's findings of fact if the district court's account of the evidence is plausible in light of the record viewed in its entirety, even though this Court would have weighed the evidence differently if it had been sitting as the trier of fact. *Henry v. Lennox Indus., Inc.,* 768 F.2d 746, 750 (6th Cir.1985). However, a district court's determination

of questions of law is reviewed *de novo.* *Loudermill v. Cleveland Bd. of Educ.,* 844 F.2d 304, 308 (6th Cir.1988). Finally, a district court has the authority to make a *de novo* determination of the magistrate's report or recommendations, and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Massey v. City of Ferndale,* 7 F.3d 506, 509 (6th Cir.1993).

B. Analysis

1. The district court did not err in awarding Anderson $111,200.53 in compensatory damages.

■ As a result of the default judgment, Defendants were liable on Anderson's claims of intentional misrepresentation as alleged in Counts II and III of his complaint. Here, Anderson's intentional misrepresentation claims were treated as claims for fraud under Kentucky common law.[2] "In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. Co. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999). By virtue of the default judgment, Anderson thus satisfied the requirements for fraud, including the condition that Defendants' fraud caused him injury.

■ Contrary to Defendants' claim, the district court did not err when it ruled that Anderson was required to show compensatory damages with "reasonable certainty" by a preponderance of the evidence. Here, the magistrate judge misstated the law when she ruled that Anderson had to prove his compensatory damages by clear and convincing evidence. As the district court properly stated:

The determination of the extent of that injury is judged under a distinct and separate standard.

As a practical matter, damages were not determined at the time default judgment was granted. This indicates the distinct and separate nature of these two determinations. To recover on a claim of fraud, a plaintiff must prove, by clear and convincing evidence, that an injury existed. (citations omitted.) Once that threshold matter is determined in the plaintiff's favor, the Court moves on to the separate determination of the extent of the damages. Injury and damages are not legal equivalents, and are therefore judged under different standards.

*Paull Anderson v. Julius Jennings Wade, Jr., et al.,* No. 94–111, slip op. at 10–11 (E.D. Ky. June 14, 2000). *See also Louisville & N.R. Co. v. Kelly's Adm'x,* 100 Ky. 421, 38 S.W. 852, 854 (Ky Ct. Ap. 1897) (finding that "damages" are "the indemnity or pecuniary satisfaction awarded for an injury," and "include all kinds of damages which might be awarded for an injury"). Given the difference between "injury" and "damages," the district court properly concluded that Anderson must show his damages to a reasonable certainty by a preponderance of the evidence, not by clear and convincing evidence. *See Rickert,* 996 S.W.2d at 469 ("In an action for fraud, it is not necessary to prove the amount of damages with certainty, but only to establish with certainty the existence of damages."); *see also Pauline's Chicken Villa, Inc., v. KFC Corp.,* 701 S.W.2d 399, 401 (Ky., 1985) (quoting *Restatement (Second) Con-*

---

**2.** As a pro se litigant, Plaintiff was entitled to a liberal construction of his pleadings and filings seeking compensatory and punitive

damages. *Boswell v. Mayer,* 169 F.3d 384, 387 (6th Cir.1999).

*tracts,* § 352 for the rule that "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty").

■ In this case, the district court did not err in finding that Anderson established by a preponderance of the evidence that he was entitled to $112,200.53 in compensatory damages. *See Dempsey v. Marshall,* 344 S.W.2d 606, 607 (Ky.Ct.Ap.1961) (holding that damages for fraudulent representations inducing a contract include not only what the purchaser has actually parted with in the bargain, but also "the benefits of his bargain, by permitting him to show what the property would have been worth had it been as represented"); *Sanders v. Chesmotel Lodge,* 300 S.W.2d 239, 241 (Ky.Ct.App.1957) ("The fundamental rule in assessing damages for fraud is that the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud."); *Glock v. Carpenter,* 184 F.Supp. 829 (E.D.Ky., 1960), aff'd. 286 F.2d 431 (6th Cir.1961) (citing *Sanders* for the proposition that "the victim of fraud is entitled to compensation for every wrong which was the natural and proximate result of the fraud"). Specifically, there was sufficient evidence that Anderson was entitled to the following damages: (1) $15,000 that he paid as consideration to secure the option contract; (2) $3,800 that he owed Gregory Childress for an investigation conducted into the potential use of crude oil found on the property in question; (3) $40,000 that he owed to Leeway Marketing for services rendered in securing a timber buyer; (4) $44,775 that he owed to the Middleton Group to cover its fees for underwriting this project and for its research and travel to determine the extent of the mineral and natural resources on the land; (5) $4.250 that he owed to C.C. Canada Forestry Co. for determining the type and quantity of the timber found on the prop-

erty; and (6) $3,375.53 in legal expenses. As the district court correctly determined, these damages were the natural and proximate cause of Defendants' fraud. *Sanders,* 300 S.W.2d at 241.

### 2. Anderson was also properly awarded $500,000 in punitive damages.

■ Before addressing whether there was sufficient evidence to support the punitive damage award, we must first consider the standard by which to review a punitive damages award under Kentucky law. In 1988, the Kentucky General Assembly, as part of a broad tort reform legislation, enacted a statute codified at Kentucky Revised Statute ["KRS"] 411.184 modifying Kentucky law with respect to punitive damages ("Kentucky's punitive damages statute"). *See Williams v. Wilson,* 972 S.W.2d 260 (Ky.1998). The statute established a new legal standard for punitive damages, departing from the traditional common-law standard that permitted the imposition of punitive damages upon a finding of gross negligence. *See Horton v. The Union Light, Heat & Power Co., Ky.,* 690 S.W.2d 382 (Ky.1985). In pertinent part, KRS 411.184 provides the following:

(1) As used in this section and KRS 411.186, unless the context requires otherwise:

(a) "Oppression" means conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship.

(b) "Fraud" means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff.

(c) "Malice" means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is

carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm.

\*    \*    \*    \*    \*    \*

(f) "Punitive damages" includes exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future.

(2) A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice.

\*    \*    \*    \*    \*    \*

(5) This statute is applicable to all cases in which punitive damages are sought and supersedes any and all existing statutory or judicial law insofar as such law is inconsistent with the provisions of this statute.

KRS 411.184. Further, KRS 411.186 provides:

(1) In any civil action where claims for punitive damages are included, the jury or judge if jury trial has been waived, shall determine concurrently with all other issues presented, whether punitive damages may be assessed.

(2) If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then assess the sum of punitive damages. In determining the amount of punitive damages to be assessed, the trier of fact should consider the following factors:

(a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;

(b) The degree of the defendant's awareness of that likelihood;

(c) The profitability of the misconduct to the defendant;

(d) The duration of the misconduct and any concealment of it by the defendant; and

(e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

(3) KRS 411.184 and this section are applicable to all cases in which punitive damages are sought.

KRS 411.186.

Following the enactment of the Kentucky punitive damages statute, the Kentucky Supreme Court in *Williams* invalidated KRS 411.184(1)(c), but expressed "no opinion herein as to the constitutionality of KRS 411.184(2)." 972 S.W.2d at 268. In subsequent decisions, the Kentucky Supreme Court has reiterated that KRS 411.184(1)(c) is unconstitutional, but has applied other sections of the statute, specifically, KRS 411.184(2). *See Berrier v. Bizer,* 57 S.W.3d 271, 283 (Ky.2001) (holding that while *Williams* declared KRS 411.184(1)(c) unconstitutional, "the opinion specifically did not purport to affect other provisions of the statute"); *Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368 (Ky.2001) ("As this appeal was practiced without any challenge to the constitutionality of KRS 411.184(2) and statutes are presumed to be constitutional, to the extent it applies here, KRS 411.184(2) would have the same dignity as any other statute."); *Bowling Green Mun. Util. v. Atmos Energy Corp.,* 989 S.W.2d 577, 580 (Ky.1999) (reviewing the case under the terms of the statute requiring proof of punitive damages by clear and convincing evidence); *Rickert,* 996 S.W.2d at 470 (finding that the jury properly considered an award of punitive damages because the plaintiff had demonstrated fraud by clear and convincing evidence under KRS

411.184, noting that "[t]he constitutionality of the statute was never challenged and it does not determine the disposition of this case").

Based upon these pronouncements of the Kentucky Supreme Court, we thus apply the Kentucky punitive damages statute to the present case, with the exception of KRS 411.184(1)(c). Specifically, pursuant to KRS 411.184(2), Anderson has the burden of proving punitive damages by clear and convincing evidence that Defendants "acted toward the plaintiff with oppression, fraud or malice." As applied to this case, Anderson has to show that he was entitled to punitive damages as a result of Defendants' fraud. As defined by KRS 411.184(1)(b), "fraud" is "an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff."

In this case, the district court applied the common law standard stated in *Horton* in awarding punitive damages in this case. In pertinent part, the district court stated:

> In order to recover punitive damages, the plaintiff must show outrageous conduct evidencing fraud, evil intent, or reckless indifference to the rights of others. *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985). In this case, the record clearly shows that the defendants have consistently acted with "reckless indifference to the rights of others." *Id.* In addition to the fraudulent acts committed, and the misrepresentations made, to entice the plaintiff into the option contract; [sic] the defendants have also flagrantly violated discovery orders in an attempt to prevent Plaintiff's recovery in this case. The plaintiff has also offered proof that the defendants have violated a number of the Revised Rules of Professional Conduct, issued by the North Carolina Bar. Finally, while a claim for punitive damages can be sustained solely based on the actions listed above; the record contains extensive evidence that the defendants continued to attempt to peddle their worthless title to the land after their encounter with the plaintiff.

*Paull Anderson v. Julius Jennings Wade, Jr., et al.*, No. 94–111, slip op. at 28–29 (E.D. Ky. June 14, 2000). Although the district court erred in applying the common-law standard in determining punitive damages in this case, we nonetheless affirm the award because there was clear and convincing evidence in the record showing that Defendants' fraudulent acts and misrepresentations enticing Plaintiff into the option contract warranted the imposition of punitive damages under KRS 411.184(2). See *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 251 (6th Cir.1994) (holding that this Court may affirm the district court on any grounds supported by the record).

■ Here, there was clear and convincing evidence that Defendants behaved fraudulently at their initial meeting with Anderson. As the district court found, Defendants did not address the defective nature of their title to the land, but "engaged in a presentation that highlighted the natural and mineral resources present on the land," making available to Anderson "the Skelly Loy report detailing the natural resources on the land in question." *Paull Anderson v. Julius Jennings Wade, Jr., et al.*, No. 94–111, slip op. at 29 (E.D. Ky. June 14, 2000). Moreover, the district court noted that the option contract references the timber studies contained in the report. The district court also found that Defendants sought to perpetrate the fraud before and after the illegality of Defendants' actions came to light. As the district court noted:

Finally, the record shows that the defendants attempted to resell their bogus title three additional times. First, on November 12, 1992, Defendants tried to peddle their title to one Dr. Harbor. See Plaintiff's exhibit no. 29. After that, the defendants were able to sell Plaintiff an option contract. Shortly after that deal fell through due to the discovery of the flawed title, Defendants attempted to sell the land to a non-profit foundation on September 3, 1993. See Plaintiff's exhibit nos. 14–17, 19, 90. Finally, in 1995, Defendants again tried to sell their defective title to the Wolford Brothers [sic]. See Plaintiff's exhibit nos. 80–88, 94, 95. This sale attempt included a letter from Defendant Wade, vouching that his client had good title to the land. See Plaintiff's exhibit no. 82. *Id.* at slip op. 31–32. Thus, there was clear and convincing evidence that Defendants acted toward Anderson with fraud as defined by KRS 411.184(1)(b).

In addition to this evidence, the district court also found that Defendants engaged in flagrant violations of the discovery orders to prevent Anderson's recovery in this case. Without citing any case law, Defendants contend that citing their discovery violations as a basis for the punitive damages award was improper because it "results in a double penalty for the same conduct," since these violations already resulted in a default judgment of liability as sanctions for their misconduct. Because Defendants' claim is not supported with any authority, it is deemed waived for appellate review. *Figueroa–Rubio v. INS,* 108 F.3d 110, 112 (6th Cir.1997). In any case, we do not express an opinion whether misconduct in discovery may be considered in determining an award of punitive damages, if such misconduct was already sanctioned.

Moreover, in awarding punitive damages, the district court also considered evidence that Defendants Julius Jennings Wade, Jr., James Wade, and their law firm Wade and Wade, violated a number of the Revised Rules of Professional Conduct, issued by the North Carolina Bar Association. Contrary to Defendants' objection, the issue about the Wades' misconduct as lawyers was raised and developed in the district court. Although Defendants argue that the Wades were not subject to the North Carolina Bar Association Rules of Professional Conduct, as cited by the district court, because they were not approved by the North Carolina Supreme Court until July 24, 1997, we note that similar rules were in effect during the time period prior to their formal adoption by the North Carolina Supreme Court. Further, even if violations of the North Carolina Bar Association Rules of Professional Conduct may not give rise to a cause of action in North Carolina, the Wades do not dispute that their conduct was in violation of the Rules of Professional Conduct, nor that violations of the rules may serve as evidence supporting a punitive damages award in a fraud action under Kentucky law. *See In re Baker,* 183 B.R. 30, 33 (Bankr.D.R.I. 1995) (considering conduct that could constitute a violation of Rhode Island Rules of Professional Conduct in making an award of punitive damages).[3]

Thus, notwithstanding the district court's failure to apply the Kentucky punitive damages statute, we uphold its award of $500,000 in punitive damages on the basis that Anderson established by clear and convincing evidence that Defendants acted toward him with fraud so as to satis-

---

**3.** We note that the North Carolina State Bar disbarred Julius J. Wade, Jr. on March 8, 1994 and James H. Wade on January 19, 2001 for various acts of misappropriation of funds unrelated to this case.

fy the requirements of KRS 411.184. Given the egregious nature of the injury and damages suffered by Anderson as a result of Defendants' inexcusable actions, we cannot conclude that the district court erred in the amount of punitive damages awarded. Based upon the reprehensibility of Defendants' conduct and the ratio between Anderson's compensatory damages and the amount of punitive damages, we also conclude that the punitive damages award in this case does not offend constitutional due process under *BMW of North America Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

### III. CONCLUSION

In this case, we conclude that the district court did not err in finding that Anderson established by a preponderance of the evidence that he was entitled to $112,200.53 in compensatory damages. Although the district court erred in not applying the Kentucky punitive damages statute set forth in KRS 411.184, Anderson was properly awarded $500,000 in punitive damages because he established by clear and convincing evidence that Defendants acted toward him with fraud, as defined by the statute, and the amount of the award was justified by the factual circumstances of this case. Accordingly, we AFFIRM the district court's judgment.