required of it by the Federal Motor Vehicle Safety Standards. As indicated above, I have no problem with this. I have a serious problem, however, with the use of Kentucky's judicial system to relieve Chrysler of an additional $3 million – more than 12 times the recoverable compensatory damages – for its supposed recklessness in failing to equip the truck with a door latch that would have spared Mr. Clark the inconvenience of buckling his seatbelt.

Accordingly, although I concur in most of Judge Oliver's well-written opinion, I respectfully dissent from Part V B of the opinion and from the affirmance of the $3 million punitive damage award.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0369P (6th Cir.)
File Name: 02a0369p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DOROTHY CLARK,
Individually and as
Administratrix of the Estate of
Charles Clark,                                    No. 97-6380
          *Plaintiff-Appellee,*

          *v.*

CHRYSLER CORPORATION,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 94-00346—Jennifer B. Coffman, District Judge.

Argued: November 2, 1999

Decided and Filed: October 24, 2002

Before: MERRITT and NELSON, Circuit Judges;
OLIVER, District Judge.*

_____

*The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1

---

## COUNSEL

**ARGUED:** Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, Washington, D.C., for Appellant. Richard Hay, Somerset, Kentucky, for Appellee. **ON BRIEF:** Theodore J. Boutrous, Jr., Thomas H. Dupree, Jr., GIBSON, DUNN & CRUTCHER, Washington, D.C., Lawrence A. Sutter, Brian D. Sullivan, REMINGER & REMINGER, Cleveland, Ohio, for Appellant. Richard Hay, Somerset, Kentucky, for Appellee.

OLIVER, D. J., delivered the opinion of the court, in which MERRITT, J., joined. NELSON, J. (pp. 33-36), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

OLIVER, District Judge. Defendant-Appellant, Chrysler Corporation ("Chrysler"), appeals a jury verdict rendered against it for $235,629.13 in compensatory and $3,000,000 in punitive damages in a product liability action brought by Plaintiff-Appellee, Dorothy Clark ("Mrs. Clark"), individually and as Administratrix of the Estate of Charles Clark ("Charles" or "Mr. Clark"), her deceased husband. It argues, in this lawsuit growing out of a car crash in which Mr. Clark was killed, that (1) the judgment for Mrs. Clark should be reversed and judgment entered in its favor because she failed to produce legally sufficient evidence to permit a reasonable jury to find causation and impose punitive damages or, in the alternative, (2) it should be granted a new trial because (a) the testimony of Mrs. Clark's expert witnesses was unreliable and should have been excluded by the trial court under Fed R. Evid. 702 for failure to conduct tests of the allegedly defective product or of alternative designs that could have prevented the decedent's injuries and death, (b) the trial court erroneously instructed the jury that compliance with federal

With the demise of KRS 411.184(1)(c) and its definition of "malice," what is it that must be proved, by clear and convincing evidence, before punitive damages may be awarded in Kentucky? Absent "oppression" or "fraud," which the plaintiff does not claim to have proved here, *Williams* teaches that we are to fall back on the Kentucky common law rule restated thus in *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985):

> "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by '*wanton or reckless disregard for the lives, safety or property of others.*'" (Emphasis supplied.)

The record before us, as I read it, merely supports a finding of garden-variety negligence on Chrysler's part. I find in the record no "clear and convincing evidence" that Chrysler was guilty of "wanton or reckless disregard" for the lives and safety of its customers. The record shows, on the contrary, that the design of Chrysler's door latch was in full compliance with Federal Motor Vehicle Safety Standard 206, promulgated by the United States Government in an effort to assure door latch safety. "In most contexts," at least, ". . . compliance with a statutory standard should bar liability for punitive damages." W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts*, § 36, at 233 n.41 (5th Ed. 1984).

The record further shows that Chrysler equipped its truck with a seatbelt that undoubtedly would have saved Mr. Clark's life if he had only used it. Virtually any product can cause injury or death if misused, and by his failure to buckle up, Mr. Clark was failing to use his truck in the manner intended by the manufacturer. The hard truth, uncomfortable though it may be to say so, is that if anyone was reckless in this situation, it was Mr. Clark himself, not Chrysler.

Under the law of Kentucky and the findings of the jury in this case, Chrysler must pay more than $235,000 in compensatory damages for its failure to go beyond what was

reform legislation designed to limit the recovery of punitive damages to cases where – "by clear and convincing evidence" – the plaintiff proves "that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."    KRS  411.184(2). "[O]ppression, fraud [and] malice" are defined in terms that bar the award of punitive damages for negligence or other misconduct not actually intended to result in injury or not committed with "flagrant indifference" to the plaintiff's rights and "a subjective awareness" that injury will result:

> "(a) 'Oppression' means conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship.
>
> (b) 'Fraud' means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff.
>
> (c) 'Malice' means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm." KRS 411.184(1).

In *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), the Supreme Court of Kentucky held KRS 411.184(1)(c) to be unconstitutional under Kentucky's "jural rights doctrine." The *Williams* court expressed no opinion as to the constitutionality of KRS 411.184(2), which requires "clear and convincing evidence" for the award of punitive damages. I presume that KRS 411.184(2) is constitutional. See *Anderson v. Wade*, 33 Fed. Appx. 750 (6th Cir. 2002), an unpublished decision of this court where we analyzed the pertinent Kentucky cases and concluded that the Kentucky punitive damages statute remains good law "with the exception of KRS 411.184(1)(c)." *Id*. at 759.

safety standards "should be considered...merely as one piece of evidence on the issues in this case," rather than instructing it as required by the Kentucky Revised Statute ("KRS") § 411.310(2) that compliance with federal safety standards created a presumption that the product, a Dodge Ram truck, was not defective, and (c) the trial court erroneously allowed Mrs. Clark's expert to testify regarding other alleged incidents as evidence that the product was defective without establishing that the incidents involved were "substantially similar" to the incident in this case.  For the reasons discussed herein, the judgment of the trial court is affirmed.

## I.

Charles Clark, an owner of a small construction company, was fatally injured on October 14, 1993,  in an automobile accident when he and his two nephews, Freddy Clark ("Freddy") and Billy Clark ("Billy"), left a job site in Gray, Kentucky, to obtain lunch.  Mr. Clark, who was driving his 1992 Dodge Ram club cab pickup on Kentucky Highway 233 with Freddy in the front seat and Billy in the back seat, stopped at the intersection of Highway 233 and Interstate Route 25. As Mr. Clark began to make a left turn onto Route 25, his truck was hit by a Kentucky State Police cruiser driven by Alfred Barnett ("Officer Barnett") approaching from his left. Officer Barnett testified that he was traveling 55 miles per hour when he saw Mr. Clark pull into the intersection. Officer Barnett applied his brakes and turned his wheels to the left in an effort to avoid the truck. However, he was not able to do so, and the right fender of his vehicle struck the truck's left front fender.  The vehicles collided in such a way that they rotated, causing them to "side slap" after impact. Mr. Clark's truck continued to rotate in a clockwise position while Officer Barnett's cruiser, traveling south at the time of impact, continued left across two northbound lanes of traffic, coming to rest after hitting a dirt embankment 153 feet away.  During the course of the accident, Charles Clark, who was not wearing a seat belt, was ejected from his vehicle and thrown into the grass median. He died six hours later at the University of Kentucky Hospital as a result of injuries

sustained in the accident. The coroner determined that the cause of death was due to cardiorespiratory arrest and blunt force injury to the thorax growing out of a motor vehicle collision. Neither of Mr. Clark's nephews was ejected. They were not wearing seat belts at the time of the accident. Officer Barnett, who was wearing a seat belt, and the dog that was traveling in the cruiser with him, were not seriously injured. The only injury Officer Barnett testified to was a three-inch laceration to his right forearm.

The District Court had diversity jurisdiction over the case. After a three-day trial, the jury rendered a unanimous verdict on October 1, 1997. The eight-person jury found in favor of Mrs. Clark on claims of strict liability, negligence and failure to warn. It stated in answer to agreed-to interrogatories:

(1) The 1992 Dodge Ram pickup truck in question was defective and unreasonably dangerous for use by Charles Clark, and that such defect or defects was a substantial factor in causing Charles Clark's injuries and death.

(2) Chrysler Corporation failed to exercise ordinary care in the design, testing, manufacturing or marketing of the 1992 Dodge Ram pickup truck in question, and that such failure was a substantial factor in causing Charles Clark's injuries and death.

(3) Chrysler Corporation failed to use reasonable care to provide adequate warning of potential dangers associated with the 1992 Dodge Ram pickup truck in question and that such failure to warn was a substantial factor in causing Charles Clark's injuries and death.

The jury found that both Chrysler and Charles Clark were each 50% at fault. It returned a verdict of $471,258.26 in compensatory damages and $3,000,000 in punitive damages. Thereafter, the court entered judgment against Chrysler for $3,235,629.13, which reflected 50% of the compensatory damages plus the total amount of the punitive damages found

_____

## CONCURRING IN PART, DISSENTING IN PART
_____

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part. Chrysler's initial assignment of error has two branches. In the first branch, Chrysler contends that the plaintiff, Mrs. Clark, failed to introduce evidence legally sufficient to show that the alleged defect in the design of the door latch system on her husband's Dodge Ram was a substantial factor in causing Mr. Clark's injuries and death. My colleagues on the panel do not find this contention persuasive. Neither do I.

In the second branch, Chrysler contends that the evidence was insufficient to support an award of punitive damages. Again my colleagues on the panel are unpersuaded. Here I must part company with them; if my understanding of the law is correct, the question of punitive damages should never have been submitted to the jury in this case.

"The whole issue of punitive damages is becoming an increasingly problematic one," our court observed in an en banc decision handed down less than a year before the case at bar went to trial, ". . . as a sort of game-show mentality leads some contemporary juries to award punitive damages in amounts that seem utterly capricious." *Mareno v. Consolidated Rail Corp.*, 99 F.3d 782, 792 (6th Cir. 1996) (en banc) (footnote omitted). "Punitive damages pose an acute danger of arbitrary deprivation of property," the Supreme Court warned in *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 432 (1994), and courts must be vigilant to see that those who engage in productive economic activity are not subjected to deprivations of property that could not only raise serious constitutional questions, but could ultimately threaten the continued vitality of our liberal economic system.

The Commonwealth of Kentucky is by no means unaware of these concerns. In 1988 the Commonwealth adopted tort

In that case, the court found that a $2,000,000 punitive damages award was grossly excessive where a jury returned a $4,000 compensatory damages award against BMW for fraud in failing to reveal to a purchaser that the automobile it bought had been repainted. In reaching the conclusion that the award violated due process, the court considered three factors: (1) the degree of reprehensibility of defendant's conduct; (2) the ratio between the plaintiff's compensatory damages award and the punitive damages award; and (3) the difference between the civil or criminal sanction that could be imposed for the misconduct. *Id*.

In none of its briefing does Chrysler indicate why, under *Gore*, a due process violation occurred in this case. However, a review of the above-mentioned factors quickly reveals that this case is a far cry from *Gore*. Here, Chrysler's conduct resulted in the loss of life, which clearly evidences a greater disregard for the rights and safety of others than failure to reveal that a car has been repainted. The disparity between the jury's compensatory damages award and its punitive damages award is also not comparable to that in *Gore*. Lastly, it can be said that automobile manufacturers are generally on notice that their reckless conduct resulting in death could trigger a substantial punitive damages award. In summary, we cannot say that the punitive damages award exceeds the constitutional limit. "Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition." *Id*. at 568. The court cannot say that the jury's award is outside the range that is permissible to advance those interests.

## VI.

Accordingly, for the foregoing reasons, the court affirms the judgment of the trial court.

by the jury. After trial, Chrysler renewed its motion for judgment as a matter of law which the court had denied at the end of Mrs. Clark's case and also filed a motion for a new trial. The court denied both motions.

## II.

Chrysler argues that the trial court should have excluded the testimony of Mrs. Clark's experts, Mr. Billy Peterson, a latch expert, and Mr. Andrew Gilberg, a B-pillar and accident reconstruction expert, because they did not perform any testing relative to the accident in suit. We review the decision of a district court to admit or exclude expert testimony for abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 138-139 (1997). Deference to the decision of the trial court "is the hallmark of abuse-of-discretion review." *Id*. at 143. Giving the ruling of the trial judge the broad range of discretion to which it is entitled, this court finds that the trial court did not abuse its discretion in this case.

In determining whether to admit expert testimony, the trial court must decide whether an expert's testimony is both relevant and reliable. *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000). Chrysler's challenge herein does not go to the relevance of the testimony given by Mrs. Clark's experts but to its reliability. In making this determination, the Supreme Court confirmed in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), that the gatekeeping function which the U.S. Supreme Court enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applies not just to scientific evidence but to all expert testimony, including testimony based on technical and other specialized knowledge. *Kumho Tire*, 526 U.S. at 141. The Court also indicated that the factors which it set forth in *Daubert* as being pertinent to whether scientific evidence should be admitted, testing, peer review and publication, potential rate of error, and general acceptance in the relevant community, may be considered by the trial court in regard to proffered non-scientific expert testimony. *Id.* However, the Court explained that whether these factors are "reasonable

measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

At trial, Chrysler filed a motion *in limine* regarding the testimony of both of Mrs. Clark's experts. In support of its motion *in limine* seeking to exclude Mr. Gilberg's testimony, Chrysler argued that Mr. Gilberg's opinions were not based on independent scientific tests that he had conducted and that he did not produce any test results on which he based his opinions. The trial court denied the motion, stating:

> [Mr. Gilberg] used a scientific method previously in testing door latches. Even though he didn't do it in this particular case, he can speak to these latches because he has previously tested similar latches. And the differences between those latches can be examined on cross-examination. . . . Those differences are not a reason to grant a *Daubert* motion.

Joint Appendix ("JA") at 99. The court stated further:

> [His opinion] is based upon his own physical examination of the latches here at issue and upon his conducting of his own testing.

> [H]is knowledge is based upon his own testimony and assists the trier of fact to understand the evidence or to determine a fact in issue. And so I'm going to let it in.

> *Daubert* goes on to talk about acceptance of others in the field and other methods of establishing reliability. And I'm satisfied that with his own testimony, that's all taken care of.

JA at 100.

Chrysler also argued in its motion *in limine* that the testimony of Mr. Peterson regarding B-pillars should be excluded because he only conducted a physical examination of the B-pillar and did not do any testing himself. Prior to

latch, Chrysler knew that seat belt usage was only 37% nationwide and was as low as 23% in states like Kentucky where there was no seat belt law. The evidence also showed that in 1988, the NHTSA sent an Advance Notice of Professional Rulemaking regarding door latch standards in an effort to formulate standards designed to decrease ejections through doors that open during accidents. All manufacturers were invited to respond. Chrysler's response showed no concern regarding these safety issues. Indeed, at trial, Chrysler's witnesses continually reiterated in response to questions seeking information on door latch design and its relationship to risk of ejection that it was not proper to correlate the door latch design to risk of ejection.

All of this evidence supported the jury's conclusion that Chrysler acted with reckless disregard for the safety of others, including Mr. Clark. The court therefore affirms the trial court's denial of Chrysler's motion for judgment as a matter of law on Mrs. Clark's claim for punitive damages to the extent it was based on insufficiency of the evidence.

2.

Chrysler also maintains that judgment as a matter of law should have been entered in its favor as to the claim for punitive damages because the jury's award was so excessive as to violate the Due Process Clause. This court does not agree.

It is clear that some award of punitive damages may be so excessive as to implicate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. As the U.S. Supreme Court said in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996):

> [e]lementary notions of fairness enshrined in our constitutional jurisprudence dictates that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.

Ample evidence was adduced at trial from which a reasonable jury could have concluded that Chrysler showed reckless disregard for the safety of others, including Mr. Clark. Mr. Peterson's testimony as to the inadequacies of the B-pillar and the fact that it was insufficient to withstand low impact accidents supports such a finding. So, too, does his testimony that the problems with the Dodge Ram B-pillar could easily have been addressed as there were B-pillars in pickup trucks manufactured by others at the relevant time that were boxed in/or supported at the area of the door latch striker. Further, Mr. Gilberg testified that the latch in the 1992 Dodge Ram was not state-of-the-art or state-of-the-industry and that a state-of-the-industry latch would have prevented the accident. There were several latch designs being used in the automotive industry at the relevant time which did not experience bypass failure and which cost no more than the K latch. In fact, Chrysler itself had utilized some of the other latches in its vehicles. Mr. Gilberg also testified that there were several inexpensive ways the Chrysler K latch could have been fixed to prevent bypass failure.

In addition, Chrysler knew that the FMVSS 206 test gave no indication of the strength of the B-pillar when subjected to twist-out force. Yet, a Chrysler representative from the Door Hardware Group testified that his group did not test for latch failures involving B-pillar twist-out. While he stated that the Structural Group did perform such tests, the Chrysler representative from the Structural Group actually testified that his group did *not* test for B-pillar twist-out. Moreover, a member of the Chrysler Safety Office testified that it was well-known that a B-pillar should be boxed (the Dodge Ram's B-pillar was not), as an unboxed piece of metal "is weak in almost every direction." JA at 279.

There was also evidence adduced at trial that Chrysler knew that if a driver was ejected, the risk of death increased multi-fold. Although Chrysler's representatives and experts emphasized at trial that the use of seat belts was the most important variable related to ejections, there was evidence to show that at the time it made the decision to utilize the K

ruling on the motion, the court summarized Mr. Peterson's testimony as follows:

> [Y]our Mr. Peterson will testify about pillars in general, particularly B pillars, and will compare the Chrysler/Dodge Ram B pillar with the B pillars of contemporary Chevrolet, Ford, Nissan and Toyota pickup trucks. Mr. Peterson will discuss B pillars in the concept of design structure and materials and deformation principles, which are basic principles of mechanical engineering. He will testify that horizontal rotation of B pillar and door latch striker is a well recognized failure of a latch system in side impact accidents.

JA at 105. Thereafter, noting that *Daubert* does not require "an expert to come in and actually perform tests in any given situation," the court concluded that this testimony should not be precluded merely because Mr. Peterson had not performed testing in the case. The court found Mr. Peterson's opinions based on his examination of the B-pillar to be sufficiently reliable because they were based on his training as a mechanical engineer and his experience as a safety standards engineer with the National Highway Traffic Safety Administration ("NHTSA"). He was therefore permitted to render an opinion at trial on how the door came open and that the latch was defective.

## A.

The trial court did not abuse its discretion in allowing Mr. Gilberg to testify at trial. The bases for Mr. Gilberg's testimony and opinions are clearly reliable. First, Mr. Gilberg demonstrated thorough knowledge of automobile door latch systems. Mr. Gilberg received an undergraduate degree in mechanical engineering from Rensselaer Polytechnic Institute and a Masters of Science Degree in mechanical engineering from the University of Michigan. He worked for Ford Motor Company for six years in the area of safety research beginning in 1978. He later worked for a four-year period with Versatech, a consulting company, doing, among other things, accident investigations for insurance companies, attorneys,

the automobile industry and local governments. In this capacity, he looked at "how vehicles acted and held up in" accidents and was sometimes involved in reconstructions of accidents. JA at 140. Eventually, Mr. Gilberg came to study the ejection of occupants from vehicles, including how and why ejections happen. In 1985, he began analyzing cases involving door latch failures. At the time of trial, he was employed by his own company and had been involved in testing door latches for strength and how they failed for twelve years. At that point, almost all of Mr. Gilberg's work dealt with door latches and door latch systems; he had done approximately 200 cases of this type by the time of trial.

Second, Mr. Gilberg has done extensive testing on door latches, and in particular, testing of bypass failure, which is what he maintains caused the door of the 1992 Dodge Ram pickup to open in this case, ejecting Mr. Clark. For example, Mr. Gilberg has designed a number of fixtures to test door latches. One of Mr. Gilberg's tests was specifically designed to test bypass failure. This test has been used by the NHTSA. The fact that he did not do any specific testing in this case goes to the weight of his testimony and not to its admissibility. *See Clay*, 215 F.3d at 668.

Third, Mr. Gilberg's testimony at trial demonstrates that he was familiar with the Chrysler K latch, the type found on the Dodge Ram which was involved in the accident, and which was the primary door latch used by Chrysler for a period of 12 to 14 years, beginning in 1981. He explained that the Chrysler K latch had two basic elements, called a ratchet and a pawl, that work together to hold the door closed. Mr. Gilberg described the ratchet as a U-shaped pivoting arm that grasps a striker (a bolt sticking out of the B-pillar at the rear opening of the door) and holds the door closed. The pawl is a detent lever with a little tooth, which "drags down and holds the ratchet in a closed position." JA at 142. In other words, when the striker on the frame moves into the latch on the door, the pawl drops down to hold the ratchet closed. When the handle is pulled, the pawl is lifted, releasing the striker and opening the door. Normally, the only way the door should

including Charles Clark." *Id*. Chrysler does not contend that this instruction was erroneous, and the instruction is in accord with Kentucky law. *See, e.g., Horton v. Union Light and Power*, 690 S.W.2d 382, 389 (Ky. 1985).[3]

---

[3] The dissent argues that the clear and convincing standard of proof found in K.R.S. § 411.184 applies. It is not clear that it does. That statute sought to limit punitive damages to cases involving malice, fraud or oppression and to change the plaintiff's standard of proof to clear and convincing evidence, as opposed to the traditional preponderance of the evidence standard. *See* M. Scott McIntyre, *The Future of Kentucky's Punitive Damages Statute and Jural Rights Jurisprudence: A Call for a Separation of Powers*, 88 KY. L. J. 719, 719-20 (1999-2000) (discussing legislature's attempt to change applicable standard of proof for punitive damage claims). The Kentucky Supreme Court, in *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), struck down that portion of the statute involving malice on the ground that the legislature could not, under Kentucky constitutional principles, supersede the common law right to recover on proof of gross negligence. While this court in an unpublished opinion, *Anderson v. Wade*, 33 Fed.Appx. 750 (6th Cir. Mar. 29, 2002), indicated that other portions of the statute were not invalidated by *Williams*, *i.e.*, the sections relating to fraud and oppression, there is nothing in the statute which would require a claim for punitive damages on the basis of gross negligence be proven by clear and convincing evidence. K.R.S. § 411.184 states:

> A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice.

Since the malice portion of the statute is no longer applicable, the clear and convincing standard would, on the face of the statute, only apply to punitive damage claims based on fraud and oppression. Here, as the dissent acknowledges, Mrs. Clark sought punitive damages on the basis of gross negligence, and not fraud or oppression. In this circumstance, it could be argued that, barring further change in the law by the Kentucky legislature, case law predating § 411.184 and employing the preponderance of the evidence standard to claims for punitive damages based on gross negligence would be applicable.

In any event, Chrysler has waived the right to raise an issue regarding the standard of proof in this case since it did not raise below or before this court any issue challenging the standard of proof applied by the district court.

injured had he remained in the car and that his ejection from the car was a result of a defect in the latch system.

## B.

Chrysler also maintains that the trial court erred in not entering judgment in its favor as a matter of law in regard to the jury's award of punitive damages. In its motion before the trial court, Chrysler argued that Mrs. Clark was not entitled to any punitive damages because they were not proven and because the jury's award of such damages was excessive.[2]

### 1.

As to Chrysler's argument that there was insufficient evidence to support an award of punitive damages, the court reviews the trial judge's denial of Chrysler's motion for judgment as a matter of law under the same standards it reviewed the substantive claims above. Judgment "should [therefore] be granted only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Morales*, 151 F.3d at 506. The court also cannot substitute its judgment for that of the jury; rather, it must review the evidence in the light most favorable to Mrs. Clark and she must be accorded every reasonable inference from the evidence. *Id.* This court finds, after review of all of the evidence, that there was sufficient evidence in the record to support an award of punitive damages.

In this case, the parties agreed on the jury instruction that was to be given by the court. It permitted the jury to return a verdict for punitive damages if the "conduct of Chrysler Corporation in designing, manufacturing and marketing the 1992 Dodge Ram pickup truck constituted gross negligence." JA at 463. The instruction defined gross negligence as "a reckless disregard for the lives and safety of other persons,

---

[2]Chrysler did not, in its motion for a new trial, seek a remittitur as to the punitive damages award. JA at 59.

open is when the inside or outside handle lifts the pawl. Bypass failure occurs when the ratchet and pawl are out of alignment with each other. When this happens, they slide by each other.

Fourth, Mr. Gilberg examined the latch in this case twice. He also examined other K latches identical to the one on Mr. Clark's Dodge Ram which had been involved in accidents. During his testimony, he emphasized there was not much damage to the frame of the door, even where the collision occurred, or to the area of the truck where the screws hold the latch onto the door. There was, however, significant damage to the B-pillar, which was twisted and rotated outward. Likewise, the striker, which would normally point forward, had been turned outward. Mr. Gilberg further testified that his examination of the latch revealed several indications that bypass failure had occurred in this case. Specifically, he pointed to the denting in the back of the latch opening where the striker was forced and a nick on the ratchet caused by the fork bolt getting hooked on the corner of the pawl. This indicated to him that the ratchet and the pawl were out of alignment and "just at the end a little bit of metal was clipped off." JA at 159. According to Mr. Gilberg, this meant that "if you lift that pawl, particularly with enough force to bottom it out here to make a nick, you have released the latch." JA at 160. As to the other K latches Mr. Gilberg examined, he testified that at least four had failed in an identical manner to the one in this lawsuit and, in total, had resulted in five ejections. He further indicated that the five bypass twist-out cases he had seen occurred within the last five or six years prior to suit.

Fifth, Mr. Gilberg's testimony at trial demonstrates that he had extensive technical knowledge on the type of bypass failure testing that was performed on Chrysler K latches manufactured at the time of the accident, and specifically, on the inadequacies of such testing. He testified that the concept of latch bypass failure has been known in the industry since this type of latch was introduced. He stated that the latch itself was designed to resist the forces described by the

Federal Motor Vehicle Safety Standards 206 ("FMVSS 206"). Those safety standards require automobiles to demonstrate, through a machine test which "rigidly holds the latch in one jaw and the striker in the other," that they cannot be pulled apart up to a certain amount of pressure. JA at 161. According to Mr. Gilberg's testimony, there are significant problems with this test in that the latch and striker are not allowed to move around relative to each other as they do in a car body. For example, they are not allowed to twist, making the latch appear stronger than it actually is. Thus, the test does not accurately relate how the latch will perform in an accident.

Mr. Gilberg testified that another problem with the test is that it requires force to be applied in only two directions–longitudinally (the way the car travels) and in a burst direction to the door, in an effort to shear the lock off. Although Mr. Gilberg testified that the Chrysler K latch did not perform poorly on these two tests, he explained that latches are almost never subjected to pure longitudinal or pure shear force during a crash. Rather, the force applied to the latch is usually a combination of not only these forces, but twist-out force as well.

The reliability of Mr. Gilberg's testimony as to this issue is substantiated by the fact that in 1974, the National Highway Traffic Safety Administrator posted a notice in the Federal Register indicating its desire to change the testing procedure for latches to make it more reflective of the kind of stress latches undergo in an accident.[1]

Finally, Mr. Gilberg's testimony at trial regarding state-of-the-art and state-of-the-industry in door latches at the time the 1992 Dodge Ram was manufactured also demonstrates that his opinions were reliable. Specifically, he testified that the

---

[1] Chrysler filed written objections to the notice, indicating that the method and fixture were developed to evaluate latch striker separation strength and that the test was not meant to be a systems test of the latch assembly and its attachments.

conclusion, the court rejected the testimony of one of plaintiff's experts, who testified that plaintiff would have been unhurt if he had remained in the car, as having no basis. The court stated:

> Given the condition of the roof after the accident and the fact that the Jetta hit the ground at the terminus of its 'pole vault' in an inverted position and continued to roll, this assertion appears to have no factual basis.

*Id.* at *5 (also noting that O'Bryan had not proposed an alternative design for a more crashworthy door lock and that the information he submitted regarding the evaluation of the latch system as a whole did not include data regarding existing practices within the industry).

The facts of *O'Bryan* are critically different from the facts of this case. Here, Mrs. Clark has produced evidence that there were feasible alternative designs to the Chrysler K latch system that would have prevented Mr. Clark's injuries. Mr. Gilberg testified that several simple fixes would have prevented bypass failure and that a state-of-the-art or state-of-the-industry latch would not have allowed the door to come open. Many of the alternative latch systems proposed by Mr. Gilberg had actually been in use by vehicle manufacturers for many years prior to the time the Dodge Ram was manufactured, *e.g.*, the "pie and cone" used by Mercedes Benz since the 1950's and which was no more costly than the K latch. Mrs. Clark's other expert, Mr. Peterson, demonstrated the difference between the unsupported sheet metal B-pillar used by Chrysler and the boxed and supported B-pillars used by Ford, General Motors, Nissan and Toyota. He testified that if the B-pillar from the Clark vehicle had had a boxed B-pillar, it would not have twisted out.

Finally, all of the evidence must be viewed in light of the fact that Mrs. Clark's evidence in this case in regard to causation does not suffer from the deficiencies we found in *O'Bryan*. As explained above, there was competent evidence before the jury that Charles Clark would not have been

corner, penetrated the upper left corner of the windshield, struck the seatbelt emergency release mechanism, and then hit the driver's side pillar. The car "pole-vaulted" on this log, stretching the door frame like a rubber band and releasing the door latch. The log was carried with the vehicle for approximately 55 feet. The log and vehicle then separated, and the rear of the car dug into the ground, causing it to rotate in the opposite direction. As the Jetta fell toward the ground, O'Bryan was ejected from the car. Moving slightly ahead of the vehicle, he came to rest on the ground and the Jetta finally landed on top of him. Estimates as to the total distance traveled by the vehicle (including yaw marks) varied from 260 feet to 282 feet.

*Id.* at *2.

At trial, O'Bryan's experts offered testimony that the door and seat belt in the Jetta were defective and that a motorized track above the door would have provided a practicable alternative design that would have prevented the plaintiff's injuries. However, in reversing the jury verdict in favor of O'Bryan, this court found that there was no proof that this alternate design would have prevented the harm, that is, "that the motorized attachment would not have activated when the door flew open in this accident." *Id.* The court stated further that:

given the fact that one log peeled back the roof of the car and the car continued to roll after that, it was incumbent on plaintiff to prove that he would have been injury free if restrained in his seat.

*Id.* at *2-3 (also finding that the plaintiff's experts had not adduced proof that the seat belt would have remained intact if the Jetta had located the emergency release mechanism between the two front seats rather than near the door mounting, another alternative design proposed by plaintiff).

Finally, the court found that O'Bryan did not prove that a defective door latch caused his injuries. In reaching this

latch in the 1992 Dodge Ram pickup was not state-of-the-art or state-of-the-industry. He noted that the hinges on the door were not damaged and that there was no technical challenge to making the door latch as strong as the hinges. Indicating that the overall problem was a "systems problem," and not just a latch problem, he explained that the strength of the latch could have been increased by stiffening up the mounting or moving the mounting points or screws closer together so they could bracket the area where the ratchet and pawl meet. This would have made the latch more resistant to prying without adding weight. Another method that could have been used to make the latch stronger would have been to utilize a ratchet which bracketed both sides of the detent lever so that the pawl tooth was inside the ratchet and could not move sideways. He described several examples in the industry that were state-of-the-art at the time Mr. Clark's Dodge Ram was manufactured, including a pin and cone system, which has a pin sticking out of the body that mates with a hole in the latch to help reinforce the latch. Mr. Gilberg testified that it was his opinion, to a reasonable degree of engineering certainty, that a state-of-the-industry latch would not have allowed the door on the Dodge Ram to open.

For these reasons, the trial court did not err in allowing Mr. Gilberg to testify at trial. Mr. Gilberg's opinion that the Dodge Ram K latch system was defective and that it was unreasonably dangerous was based on his technical knowledge with respect to automobile door latch systems, his extensive testing of door latch bypass failure, his familiarity with the Chrysler K latch, his examination of the latch in this case as well as other K latches identical to the one involved in this lawsuit, his technical knowledge as to the type of bypass failure testing that was performed on Chrysler K latches manufactured at the time of the accident, as well as the fact that a state-of-the-industry door latch probably would have prevented Mr. Clark's ejection. The court therefore agrees with the trial court that under *Daubert*, there was a sufficiently reliable foundation for Mr. Gilberg's testimony.

B.

The trial court also did not err in denying Chrysler's motion *in limine* with respect to Plaintiffs' other expert, Mr. Peterson. Mr. Peterson was hired to testify as an expert on why the door on Mr. Clark's truck came open and on accident reconstruction. Like Mr. Gilberg, there was a sufficiently reliable basis for Mr. Peterson's testimony at trial.

As the trial court found, the fact that Mr. Peterson only conducted a physical examination of the B-pillar and did not do any testing himself does not render his testimony unreliable. *Clay*, 215 F.3d at 668. First, Mr. Peterson's testimony as to the cause of the door opening was based on his extensive background in automobile safety testing. Mr. Peterson graduated from North Carolina State with a Bachelor of Science Degree in mechanical engineering in 1961. After working a short period with the Army at Aberdeen Proving Grounds in the automotive division, he worked in aerospace at NASA and Sperry Rand for seven years. In 1970, he began a thirteen-year stint with the NHTSA, the U.S. Department of Transportation entity responsible for establishing the rules and standards automobile manufacturers have to comply with in the United States. At the NHTSA, Mr. Peterson was a safety standards engineer responsible for writing standards to apply to vehicles. During this period, he also set up a small test facility in Atlantic City, where NHTSA did testing, research and development. There he was involved in testing of various kinds, including side impact testing and rear impact testing. In 1976, he transferred to the Transportation Research Center of Ohio, another NHTSA facility, to create a research, development, and testing arm of the Center. He was a division chief in charge of project engineering and was involved in a substantial amount of testing for safety-related defects in vehicles. His work with this group also included research on barrier tests for the NHTSA research and development group in Washington.

In 1984, Mr. Peterson established Automobile Safety Testing, Incorporated. For the first six or seven years of the

In relying on this unpublished opinion of our court, Chrysler maintains that pursuant to Sixth Circuit Rule 26(g), the case "has precedential value in relation to a material issue in the case and that there is no opinion which would serve as well." In disputing that the crashworthiness doctrine should not be applied to this case, Mrs. Clark argues that Kentucky courts have never adopted the doctrine and notes that there are a number of cases which serve as relevant precedent for the issues before the court. Chrysler does not dispute that the *O'Bryan* court acknowledged that Kentucky courts have not adopted the crashworthiness doctrine. Indeed, it cites this fact in favor of why the court should look to *O'Bryan* as precedent for applying the doctrine under Kentucky law.

Where the crashworthiness doctrine applies, a plaintiff must prove, *inter alia*: that there is a practicable, feasible, safe, alternative design; that the design would have remedied the problem; and that in the absence of the alleged defects, the decedent would not have been injured or would have incurred less of an injury. *Id.* Assuming, without deciding, that the Kentucky courts would adopt the crashworthiness doctrine, this court finds that Mrs. Clark has proven causation under the doctrine as well as under other existing principles of causation under Kentucky law.

In *O'Bryan*, the plaintiff, a 16-year old boy, was seriously injured when he drove a 1997 Volkswagen Jetta off the road at an excessive rate of speed. He sued Volkswagen, maintaining that the injuries which he suffered were caused by a defective seat belt and door latch. The court in that case described the accident as follows:

> After leaving the road, the car crossed over a ditch, struck an embankment, climbed the embankment, and struck two or three of a group of three large logs at the top of the embankment. At this point the car was upside down and moving forward. One log hit the roof of the car with such force that the roof was peeled back and upward on the driver's side. Another log came diagonally across the hood of the car from the right front

in the fender/wheel area, and not to the frame or close to the door latch.

Mr. Peterson also testified that the impact to the left front wheel of the pickup truck would have immediately propelled Mr. Clark toward the impact and into the left front door of the vehicle. He supported this opinion with evidence that the door was bowed from the inside out, indicating that his body made contact with the door. He further opined that Mr. Clark was ejected from the vehicle immediately upon impact, the point at which maximum force was exerted, and before the second contact between the vehicles when they "side-slapped." JA at 313.

Finally, there was evidence produced at trial to establish that Mr. Clark did not receive massive crash injuries to his thorax while inside the vehicle. The investigating police officer testified that upon examination of the truck after the accident, he found nothing protruding into the driver's space inside of the truck. The officer testified that there was no sign that Mr. Clark had significant contact with the steering wheel. Specifically, there was no damage in the passenger compartment space, other than to the inner door panel into which Mr. Clark was thrown.

### 2.

Chrysler does not disagree that under § 402A, the appropriate question is whether the defective latch system was a substantial factor in bringing about the injuries or death of Mr. Clark. However, citing this court's decision in *O'Bryan v. Volkswagen of America*, Nos. 93-5292 and 93-5314, 39 F.3d 1182, 1994 WL 599450 (6th Cir. 1994), Chrysler maintains that because Mr. Clark's own actions precipitated the automobile accident, the so-called "crashworthiness" doctrine applies to this case. Under the crashworthiness doctrine, "courts deny recovery unless the plaintiff establishes by competent expert testimony that the defect was responsible to some degree for enhancement of injury to the plaintiff." *Id.* at *4.

company's existence, it did consulting work for manufacturers, including Chrysler, performing various types of tests. Even after Mr. Peterson started his company, he continued to consult with Transportation Research Center of Ohio for six years. Eventually, the company began doing less work for manufacturers than previously and became more involved in litigation.

Mr. Peterson testified that through his work with the NHTSA and at Automobile Safety Testing, he has been involved in hundreds of crash tests. Some of the side impact crash tests he worked on involved evaluating door latches. Most of the crash tests were run with dummies so that Mr. Peterson and others could study occupant kinematics, how the dummy moved if it hit anything, and the extent to which it would have been injured if it were a human. Occasionally, these tests would be run with the occupant unrestrained.

Second, Mr. Peterson's opinions and his testimony in the case were based in part on his examination of Mr. Clark's truck, the accident scene, the police report, the photographs and the depositions in the case. He originally examined the truck in Kentucky but then brought it back to his facility in Ohio for more in-depth inspection. Although he was not able to actually view the police car, he studied photographs of it.

Based on his examination of the truck as well as his extensive knowledge of automobile safety testing, Mr. Peterson explained the structure to which the door attached when it closed was called the "B-pillar." He described the B-pillar as the "skeleton" of the vehicle and noted that pillars are usually reinforced to act as a structure. According to Mr. Peterson, one of the most efficient and easiest ways to make a structure is to make a box of sheet metal by forming a square and spot welding it. However, he described the B-pillar in this case as being little more than the sheet metal body of the vehicle. It is very lightly reinforced sheet metal which, for the most part, has not been formed into a box. He described the metal as a low alloy steel which is high strength in tension (i.e., when it is grabbed on either side and pulled),

but is not very strong in bending or shear. Mr. Peterson testified that in his opinion, the B-pillar involved in this case was defective at the time the vehicle was made and assembled in 1992. He noted that after the accident, "the striker which should be directly parallel to the center line of the vehicle . . . it's pointed out at an angle to that direction." JA at 324. He described the B-pillar as being bowed outward.

Third, Mr. Peterson's testimony at trial regarding the state-of-the industry in B-pillars at the time the 1992 Dodge Ram was manufactured also demonstrates that his testimony and opinions were reliable. At trial, Mr. Peterson testified about how other vehicles at the time the Dodge Ram was manufactured, including a Toyota pickup, a 1991 Nissan, and a 1989 Ford, had "boxed" B-pillars; that is, the B-pillar was boxed and reinforced in the area of the striker. Analyzing a B-pillar of the type used in the Chrysler pickup involved in the accident, Mr. Peterson noted that it did not utilize the box within a box design as in the other vehicles. Although the B-pillar in Mr. Clark's truck did have some boxing from the bottom of the window up, the boxing did not begin until "considerably above the striker." Mr. Peterson testified that the B-pillar in Clark's truck was twisted out at the place where the latch striker plate is attached. According to him, the latch failed because there was nothing below the window to prevent the B-pillar from twisting out. Mr. Peterson testified that the latch on the Dodge Ram was clearly not state-of-the-art; to the contrary, it was probably 40 years out of date. He further testified that he had never seen a B-pillar that was a single piece of sheet metal like the one in the Dodge Ram. He concluded that the B-pillar was defectively designed and that boxing would have prevented the twist-out.

Finally, Mr. Peterson's testimony was based in part on general acceptance in the automobile industry regarding B-pillar testing at the time the Dodge Ram was manufactured. Mr. Peterson indicated that though B-pillar twist-out was a known failure mode in the automobile industry, he had never seen one to the extent of the one involved in this lawsuit. He noted that in 1987, General Motors submitted a twist-out test

Kentucky law, a defect can be said to be the cause of an injury or death if it is a substantial factor in bringing about the injury or death. *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980). At trial, Mrs. Clark sought to establish that Mr. Clark's injuries and death were caused by a defective door latch on the 1992 Dodge Ram pickup that he was driving at the time of his death. On review of the trial record, we find that there was evidence in the record from which the jury could have concluded that the Dodge Ram's defective door latch was a substantial factor in bringing about Mr. Clark's death.

Specifically, Mrs. Clark offered testimony to establish that the accident did not occur at high impact and that Mr. Clark would not have been seriously injured or killed had his door latch not failed and he not been ejected from the truck. The fact that neither of Mr. Clark's nephews was ejected and that neither suffered any serious injuries supports this theory. Freddy, who was sitting in the front passenger seat at the time of the accident, testified that the accident "stoved my neck up a little bit, but it didn't hurt me that bad." JA at 238. Billy, sitting in the back seat, was seen in the emergency room, where he was given Tylenol and sent home. Likewise, Officer Barnett and the dog that was traveling in the cruiser with him were not seriously injured.

Officer Barnett's testimony at trial that the collision between the two vehicles was simply a "glancing blow" lent further support to Mrs. Clark's position. JA at 240B. The investigating police officer, Gary Martin, also described the collision as a "glancing blow" and noted that "it was not a direct 90 degree blow at all." JA at 244. Mr. Peterson, who provided expert testimony on accident reconstruction, testified that the blow to the truck resulted in a change in velocity of "approximately 15 miles per hour on the truck." JA at 309. He explained that this "would be like taking this truck and running it down to a concrete barrier approximately at 15 miles per hour." *Id.* (noting that the crash test standard for new cars was 30 miles per hour). There was also testimony at trial by the investigating police officer and others that the damage to Mr. Clark's vehicle was mostly to the body

regard to Mrs. Clark's claim for compensatory damages and her claim for punitive damages. The court will first address Chrsyler's arguments in regard to compensatory damages.

## A.

To support its motion for judgment as a matter of law with regard to compensatory damages, Chrysler maintains that Mrs. Clark failed to establish the cause of Mr. Clark's death. Specifically, Chrysler argues that there was insufficient evidence presented to support a jury finding that Mr. Clark's ejection from the vehicle caused his death rather than, for example, injuries he sustained inside the vehicle. Inasmuch as the court has already determined that the trial court did not err in refusing to bar testimony of Mrs. Clark's experts under Fed. R. Evid. 702 or in admitting testimony regarding other accidents, the court will consider Chrysler's arguments with respect to its motion in light of all of the evidence in the record.

In a diversity case, the denial of a motion for judgment as a matter of law based on sufficiency of the evidence is reviewed under the law of the state whose substantive law governs, which in this case is Kentucky. *See Morales v. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998). Under Kentucky law, a motion for judgment as a matter of law "should be granted only if there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Id.* (citing *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992)). In the determination of such a motion, every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made. *Id.*

## 1.

Kentucky has adopted § 402A of the Restatement (Second), of Torts, which imposes liability on product manufacturers upon a showing that the product is "in a defective condition unreasonably dangerous to the user or consumer." Under

procedure to NHTSA for informational purposes. The procedure was also made available to other automobile manufactures, including Chrysler. Despite its awareness that General Motors was testing its B-pillars for twist-out, Chrysler did not choose to test its latches for twist-out failure.

For these reasons, Chrysler's motion *in limine* to exclude Mr. Peterson was properly denied by the trial court. Mr. Peterson's opinions were based on his extensive background in automobile safety testing; his examination of Mr. Clark's truck, the accident scene, the police report, the photographs and the depositions in the case; the state-of-the-art and state-of-the industry in B-pillars; and general acceptance in the automobile industry regarding B-pillar testing at the time the Dodge Ram was manufactured. The court therefore agrees with the trial court that under *Daubert*, there was a sufficiently reliable foundation for Mr. Peterson's testimony.

## III.

Chrysler also argues that it is entitled to a new trial because the trial court permitted Mr. Gilberg to testify regarding four other alleged incidents as proof that the Dodge Ram door latch was defective, even though there was no showing that the other incidents involved circumstances "substantially similar" to those surrounding Mr. Clark's accident.

In order for evidence of prior accidents to be admissible, the prior accidents must be "substantially similar" to the accident in suit. *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 101 (6th Cir. 1989). "Substantially similar means that the accidents must have occurred under similar circumstances or share the same cause." *Id.* at 102. In reviewing the admission or exclusion of evidence concerning accidents or incidents, this court applies an abuse of discretion standard. In making this determination, the trial court's decision is to be given great latitude and it cannot be reversed unless there is a strong showing of abuse. *Id.* Upon review, we conclude that the trial court did not abuse its discretion in allowing Mr. Gilberg to testify about the four prior Chrysler K latch failures.

The testimony to which Chrysler objects occurred during the direct examination of Mr. Gilberg concerning why the test required by FMVSS 206 did not realistically represent what was likely to happen in a side impact accident. During this portion of his direct examination, Mr. Gilberg testified that FMVSS 206:

is a test of either the shear strength or the tensile strength of the latch. This latch, the latches almost never--I could even say in a crash a latch is almost never put in a pure tension or a pure shear. It's either a combination of both, usually there is a twist-out force acting on the latch as well.

JA at 164. Mr. Gilberg indicated that from his examination of the Dodge Ram latch, he could tell that it was subjected to a twist-out force. Counsel thereafter sought to elicit testimony from Mr. Gilberg regarding his examination of Chrysler K latches in other accidents. Chrysler's counsel objected on the ground of relevance, and the following colloquy took place at side bar:

MR. SUTTER [Defendant's counsel]: He's never seen an ejection in this type of vehicle. He has seen ejections in other vehicles, other makes and other models. None in a damaged club cab.

THE COURT: Where are you going with this?

MR. HAY [Plaintiff's counsel]: Your Honor, he's - he's got five other latches.

THE COURT: Five K latches?

MR. HAY: Pardon me?

THE COURT: Five K latches?

MR. HAY: Oh, yes, had the same failure.

MR. SUTTER: In other vehicles, in other accidents.

evidentiary presumptions." The court clarified the purpose of such presumptions, explaining that they:

alter the burden of going forward with the evidence, and thus may result in a directed verdict in the absence of countervailing evidence. [However,] the jury instructions should be framed only to state what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof.

*Id.* The *Chapman* court also described the Kentucky approach to jury instructions as not to provide detail, but only to provide the "'bare bones' of the question for jury determination." *Id*.

The decision by the Kentucky Court of Appeals in *Leslie v. Cincinnati Sub-Zero Products*, 961 S.W.2d 799, 803 (Ky. App. 1998), further supports the conclusion that the trial court did not err in not giving a jury instruction that Chrysler's compliance with FMVSS 206 created a presumption that the Dodge Ram pickup truck was not defective. In *Leslie*, the appellate court overruled the trial court's granting of the defendant's summary judgment motion, where the defendant had relied on the presumptions in KRS § 411.310. In doing so, the Court stated, "[t]he statutory presumptions of KRS § 411.310 do no more than leave the burden of proof with [plaintiff] to prove that [the product] was defective." *Id*.

For the above-mentioned reasons, this court finds that the Kentucky Supreme Court is unlikely to conclude that a jury instruction on the presumption established in KRS § 411.310(2) is necessary. Therefore, because the instruction given by the court adequately informed the jury of the relevant considerations and provided the jury a basis in law for reaching its decision, the trial judge did not err in failing to give the instruction requested by Chrysler.

V.

Chrysler also argues that the trial court erred in refusing to grant its motion for judgment as a matter of law, both in

found that no such jury instruction was required.  In *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 333 (4th Cir. 1991), the parties agreed that at the time the helmet was designed and manufactured, there were three industry standards which existed pertaining to the manufacturing of helmets.  The parties also agreed that the helmet at issue complied with each of the standards. After substantial evidence was presented that the product was defective, the trial court concluded that the presumption was no longer a matter to be considered.  The trial court, therefore, sent the case to the jury without any instruction regarding the presumption set forth in KRS § 411.310(2).  The Court of Appeals agreed that this was proper, stating:

> [i]f the plaintiff fails to present substantial evidence to prove his case that a product was defective, the court will direct the verdict; if the plaintiff presents substantial evidence that carries him over the directed verdict threshold, the evidence will take the case to the jury and, at the same time, overcome the presumption created by the statute.  The standard for rebutting the presumption under the statute, *i.e.*, by introduction of evidence that shows a defect by a preponderance of the evidence . . . is the same as that which makes out a *prima facie* case for the plaintiff.

*Id*.  Indeed, the court noted that it could "perceive no reason why the trial court would ever have to instruct on this statutory presumption."  *Id.*  ("Having burst the bubble by the introduction of evidence [of product defect], the plaintiff was entitled to have the question decided on the evidence and the presumption of KRS 411.310(2) was no longer applicable.").

The Fourth Circuit's opinion in *Sexton* is in accord with the manner in which presumptions are generally handled in civil cases in Kentucky, where juries are not normally instructed in regard to presumptions except in a narrow set of circumstances. *Id.*  As the Kentucky Supreme Court stated in *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 824 (Ky. 1952), "[i]n Kentucky jury instructions do not include

THE COURT: That's cross examination.  Overruled.

JA at 166-167.

Thereafter, Mr. Gilberg testified that he had examined other K latches identical to the one involved in the lawsuit and that four of them had failed in a manner "identical" to the latch involved in the lawsuit, resulting in five persons being ejected. JA at 167.  He indicated that these latches had failed in the five or six years prior to trial and that they involved bypass twist-out failure of the locks just as the lock involved in the Clark accident did.

It is clear that the purpose of Mr. Gilberg's testimony about the four recent instances where he had seen the K latch suffer a bypass twist-out failure was to further demonstrate that door latches failed in ways that were not measured by FMVSS 206.  His expertise taught him that these bypass failures were a result of the vehicles involved being subjected to a twisting or prying load, as in the accident in suit.  From the context of Mr. Gilberg's testimony, it is evident that the prior accidents shared the same cause as Mr. Clark's accident. Mr. Gilberg's testimony clearly demonstrated that he could tell by looking at a door latch whether or not the latch had been subjected to a twist-out force or prying load during an accident.  Because Mr. Gilberg could tell that the latches in the prior accidents as well as the latch in the accident in suit had all been subjected to a twist-out force and not just a tensile and/or shear force.

Although the fact that the accidents shared the same cause would have been enough to support the trial court's conclusion that Mr. Gilberg's testimony should be admitted, the testimony also could have been admitted on the basis that Mr. Clark's accident involved similar circumstances as the prior accidents.  In order to prove that an accident occurred under similar circumstances, it is not necessary to prove, as Chrysler argues, that the prior accidents involved a vehicle identical to the one driven by Mr. Clark or that all of the circumstances of the accidents are identical.  As the Tenth Circuit noted in *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235 (10th Cir. 2000):

The substantial similarity rule does not require identical products; nor does it require us to compare the products in their entireties. The rule requires substantial similarity among the variables relevant to the plaintiff's theory of defect.

*Id.* at 1248. In this case, all of the incidents Mr. Gilberg testified to involved failure of the K latch in accidents involving Chrysler vehicles. Particularly in light of testimony in the case that Officer Barnett's cruiser hit Mr. Clark's truck at a relatively low impact (*i.e.*, most likely at a lower, or at most, the same, impact than the prior accidents), the trial court would have been justified in concluding that the circumstances of the prior accidents were sufficiently similar to the accident in this case to allow Mr. Gilberg's testimony.

Giving the trial judge the latitude required by the abuse of discretion standard, we find that she did not abuse her discretion in allowing Mr. Gilberg's testimony on the four prior accidents and requiring Chrysler to show on cross-examination such dissimilarities between the accidents as it wished.

## IV.

Chrysler lastly argues that it is entitled to a new trial because the trial court erroneously failed to give a jury instruction that Chrysler's compliance with FMVSS 206 created a presumption that the Dodge Ram pickup truck was not defective. Instead of such an instruction, the trial court gave the following instruction:

You have heard testimony that the door latch and hardware of the 1992 Dodge Ram pickup truck complied with Federal Motor Vehicle Safety Standard 206. Compliance with Federal Motor Vehicle Safety Standard 206 does not exempt Chrysler Corporation from any liability you may find. This standard should be considered by you merely as one piece of evidence on the issues in this case. The application of the standard to the

facts of the case is solely for you to determine, as is the weight to be given the standard in determining the issues.

JA at 462.

This court reviews a district court's refusal to give requested jury instructions under an abuse of discretion standard. *See Buziashvili v. Inman*, 106 F.3d 709, 715 (6th Cir.1997). We review jury instructions "as a whole in order to determine whether the instructions adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000) (citation omitted).

To support its argument that Chrysler's compliance with FMVSS 206 created a presumption that the Dodge Ram pickup truck was not defective, Chrysler cites Kentucky Revised Statutes ("KRS") § 411.310(2), which states:

In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured.

Chrysler acknowledges that the Kentucky Supreme Court has not addressed the issue of whether the presumption embodied in KRS § 411.310(2) requires a jury instruction. *See Owens-Corning Fiberglass Corp. v. Golightly*, 976 S.W. 2d 409, 415 (Ky. 1998) (refusing to address the issue because it had not been presented for appellate review). It nevertheless argues that pursuant to KRS § 411.310(2), it was entitled to its requested instruction.

On review, the court finds that the trial court did not abuse its discretion in refusing to give the instruction requested by Chrysler. The Fourth Circuit, in applying KRS § 411.310(2) in a product liability action against a helmet manufacturer,